AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Louisiana

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>$1,240,254.21 ON DEPOSIT AT HANCOCK<br>WHITNEY BANK IN ACCOUNT NUMBER<br>110119387 | )<br>)<br>)   Case No.   19-12847<br>)<br>) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___SOUTHERN___ District of ___MISSISSIPPI___ is subject to forfeiture to the United States of America under ___21___ U.S.C. § ___853(f)___ *(describe the property)*:
and pursuant to 18 U.S.C. § 982(b):

$1,240,254.21 ON DEPOSIT AT HANCOCK WHITNEY BANK IN ACCOUNT NUMER 110119387 HELD IN THE NAME OF LAZARUS SERVICES LLC.

The application is based on these facts:

SEE ATTACHED

☑ Continued on the attached sheet.

_____
*Applicant's signature*

FBI SA Ronald Rushneck
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___09/27/2019___

_____
*Judge's signature*

City and state:  New Orleans, Louisiana

Hon. Dana M. Douglas, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS

I, Ronald Rushneck, being duly sworn, depose and state as follows:

### I.     AGENT'S BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), Miami Division.  I have been employed in this capacity for approximately ten years.  Previous to my assignment to the Miami Division I worked nine years of violent gang investigations and one year of counter terrorism while assigned to the FBI Boston Division.  I am presently assigned to investigate a wide range of health care fraud matters, including schemes to defraud Medicare and Medicaid.  In this capacity, I am authorized to conduct investigations into criminal violations committed against the United States, including, but not limited to health care fraud, payment and receipt of illegal health care kickbacks, making false statements in connection with a health care benefit program, and related conspiracies.  I am authorized to execute seizure warrants.  Prior to my law enforcement career, I was employed for four years as a sales representative for a veterinary medical company called Idexx.  Prior to my time at Idexx, I was a United States Army Combat Engineer Captain.  I served two years in Iraq during Operation Iraqi Freedom from April 2003 to April 2004 and January 2005 to January 2006.  I have received training in investigating various types of criminal activity, including fraud, at FBI headquarters at Quantico, Virginia.

2.      I am personally involved in this investigation along with other federal agents.  The statements contained in this affidavit are based upon a review of both public and private records and interviews conducted by me and other federal agents of witnesses knowledgeable about the facts underlying this investigation.  Because this affidavit is provided for the limited purpose of establishing probable cause for seizure warrants, it does not include every known fact concerning

this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause for the requested warrants.

## II.   SUBJECT PROPERTY

3.   Paragraphs 4 through 75 of this affidavit are identical to the affidavit offered on September 26, 2019, in support of the related seizure warrants for **TARGET ACCOUNTS 1** through **15**, with the exception of paragraph 63. This affidavit contains additional facts, described in paragraph 63, related to funds on deposit at Hancock Whitney Bank in account number 110119387 held in the name of Lazarus Services LLC ("**TARGET ACCOUNT 4**"). The previous warrant authorized the seizure of $407,104 from **TARGET ACCOUNT 4**, an amount of money directly traceable to the crimes described herein. As further described in paragraph 63, after serving the seizure warrant on Whitney Hancock Bank, your affiant learned that additional proceeds of this health care fraud and health care fraud conspiracy were deposited into an account **TARGET ACCOUNT 4**, although most of those funds have since been withdrawn. This affidavit is submitted in support of an application to seize the full remaining balance subject to forfeiture, $1,240,254.21 on deposit in **TARGET ACCOUNT 4**. The accounts identified in this affidavit are as follows (collectively, the "**TARGET ASSETS**"):

a.   Bank of New York Mellon in account number 000-9076124 held in the name of Performance Laboratories LLC ("**TARGET ACCOUNT 1**");

b.   PNC Bank in account number 53-8709-2757 held in the name of Clio Laboratories LLC ("**TARGET ACCOUNT 2**");

c.   Wells Fargo Bank in account number 9318762276 held in the name of Clio Laboratories LLC ("**TARGET ACCOUNT 3**");

d.  $1,240,254 on deposit at Hancock Whitney Bank in account number 110119387

held in the name of Lazarus Services LLC ("**TARGET ACCOUNT 4**");

e.  $449,206 on deposit at Frost Bank in account number 98-0071196 held in the name

of Lazarus Services LLC ("**TARGET ACCOUNT 4A**");

f.  any and all funds on deposit at PNC Bank, account number 53-6032-8088 in the

name of Elite Medical Laboratories Inc. ("**TARGET ACCOUNT 5**");

g.  any and all funds on deposit at Bank of America, account number 334048232870

in the name of Performance Laboratories LLC (hereinafter "**TARGET

ACCOUNT 6**");

h.  any and all funds on deposit at PNC Bank, account number 53-9242-5309 in the

name of Alpha Medical Consulting Inc. (hereinafter "**TARGET ACCOUNT 7**");

i.  any and all funds on deposit at Bank of America, account number 334051314375

held in the name of Elite Diagnostics Labs Inc. ("**TARGET ACCOUNT 8**");

j.  any and all funds on deposit at SunTrust Bank, account number 1000201820619

held in the name of Alpha Medical Consulting Inc. (hereinafter "**TARGET

ACCOUNT 9**");

k.  any and all funds on deposit at Bank of America, account number 334046706453

held in the name of Samiya Mustafa (hereinafter "**TARGET ACCOUNT 10**");

l.  any and all funds on deposit at Veritex Community Bank, account number

5501346794 held in the name of Souq Markets LLC (hereinafter "**TARGET

ACCOUNT 11**");

m. any and all funds on deposit at Veritex Community Bank, account number 5501364810 held in the name of Souq Markets LLC (hereinafter "**TARGET ACCOUNT 12**");

n. any and all funds on deposit at Veritex Community Bank, account number 5501347644 held in the name of Souq Markets LLC (hereinafter "**TARGET ACCOUNT 13**");

o. any and all funds on deposit at PNC Bank, account number 5392425165 held in the name of Souq Markets LLC (hereinafter "**TARGET ACCOUNT 14**");

p. any and all funds on deposit at Fidelity Bank, account number 170021175 held in the name of Shefa International LLC (hereinafter "**TARGET ACCOUNT 15**").

4.      Based on the facts set forth in this affidavit, there is probable cause to believe that the **TARGET ASSETS** are subject to forfeiture as property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of health care fraud and a health care fraud conspiracy in violation of 18 U.S.C. §§ 1347 and 1349, and/or property involved in money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such property.

5.      In particular, as described below, this criminal investigation has revealed that Khalid Satary ("Satary") owns several laboratories that submit false and fraudulent claims to Medicare for genetic tests purportedly provided to Medicare beneficiaries. As explained below, Satary procured these tests by paying illegal kickbacks and bribes to patient recruiters who used telemarketing to find beneficiaries to agree to take the test, without regard to whether the tests were medically necessary, and used telemedicine to obtain doctor's orders for the tests.

6.      As also discussed below, Satary had a prior federal felony conviction relating to a fraudulent copyright infringement conspiracy before he began operating the lab. He hid his

ownership and control of the labs from Medicare by having nominee owners, including having a close family relative sign corporate records and Medicare enrollment records identifying the nominee owners, rather than Satary, as the owners of the labs. He also concealed his ownership and control over the bank accounts to which Medicare issued the payments fraudulently requested by the labs. Satary did this by, again using nominee owners as signatories on the accounts. In this way, Satary committed money laundering by concealing and hiding his ownership and control over the funds Medicare paid to the labs. Satary then laundered the money again, this time by transferring the money to two types of accounts: (i) a personal account in the name of his family member, which Satary controlled; and (ii) additional corporate accounts that Satary controlled, but which he hid through the use of nominee owners. Satary used these accounts to purchase assets for himself and his family, and to pay the illegal kickbacks and bribes to the patient recruiters.

7.       The accounts into which Medicare directly deposited fraud proceeds are **TARGET ACCOUNTS 1** through **4A**. The government herein seeks warrants to seize the funds remaining in these accounts traceable to these proceeds, as described below. Satary then laundered the proceeds through **TARGET ACCOUNTS 2** and **5** through **15**. The government herein seeks warrants to seize any and all funds in these accounts traceable to these proceeds, as described below, because the accounts themselves and all the funds in the accounts were also involved in the concealment money laundering conduct, as described below.

III.   **PROBABLE CAUSE**

### A. Entities and Individuals

8.      Khalid Satary ("Satary") is a resident of Gwinnett County, Georgia.

9.      Lazarus Services, LLC ("Lazarus Services") is a Medicare provider with a principal place of business located in Orleans Parish, Louisiana, that purports to provide genetic testing to Medicare beneficiaries.

10.     Clio Laboratories, LLC ("Clio Labs") is a Medicare provider with a principal place of business in Gwinnett County, Georgia, that purports to provide genetic testing to Medicare beneficiaries.

11.     Performance Laboratories, LLC ("Performance Labs") is a Medicare provider with a principal place of business in Oklahoma County, Oklahoma, that purports to provide genetic testing to Medicare beneficiaries.

12.     Elite Laboratories, LLC ("Elite Labs") is a Medicare provider with a principal place of business in Gwinnett County, Georgia, that purports to provide genetic testing to Medicare beneficiaries.

13.     Alpha Medical Consulting, Inc. ("Alpha Medical Consulting") is a company with a principal place of business in Gwinnett County, Georgia, that purports to provide consulting services to laboratories.

14.     Souq Markets, LLC ("Souq Markets") is a company with a principal place of business in Gwinnett County, Georgia.  Satary is the owner of Souq Markets, LLC.

15.     Shefa International, LLC ("Shefa International") is a company with a principal place of business in Gwinnett County, Georgia.  According to state incorporation records, Shefa International is owned by a close family member of Satary's.

16.     Company 1 and Company 2 are companies incorporated under the laws of Georgia. According to incorporation records filed with the Georgia Secretary of State, Individual 1 was the owner of Companies 1 and 2.

17.     Company 3 is a company incorporated under the laws of Florida, with its principal place of business in Fort Lauderdale, Florida. According to incorporation records filed with the Florida Secretary of State, cooperating witness 1 ("CW 1") was the owner of Company 3, and cooperating witness 2 ("CW 2") was an employee of Company 3. After being approached by federal agents, CWs 1 and 2 admitted their criminal conduct and began cooperating in the hopes of receiving a recommendation from the government for a lesser sentence.

18.     Company 4 is a company incorporated under the laws of South Carolina. Individual 2 is the owner of Company 4.

19.     Individual 1, Individual 2, CW 1 and CW 2 had no medical training, and were not medical professionals.

20.     Cooperating witness 3 ("CW 3") is a resident of Madisonville, Louisiana. Since approximately 2017, CW 3 served as the Chief of Operations of Company 7, a Mississippi-based clinical laboratory, and, as of approximately January 2019, CW 3 served as the interim Chief Executive Officer of Lazarus Services. CW 3 is the relator in a *qui tam* filed in the United States District Court for the Southern District of Florida, alleging, among other things, that the Satary has caused Performance Labs, Clio Labs and Lazarus Services to submit false and fraudulent claims to Medicare.

21.     CW 4 is a resident of Palm Beach County, Florida. CW 4 was a marketer for the Satary Labs. After being approached by federal agents executing a search warrant for CW 4's cellular phone, CW 4 admitted his/her criminal conduct and began cooperating in the hopes of

receiving a recommendation from the government for a lesser sentence.  CW 4 is not a medical professional and has no medical training.

22.      Although state incorporation records for Lazarus Services, Clio Labs and Performance Labs, Elite Labs and Alpha Medical Consulting identify various individuals being the registered agents, owners or officers of those entities, multiple witnesses have told agents that, in truth Satary is the true owner of all four companies.  Accordingly, Lazarus Services, Clio Labs, Elite Labs and Performance Labs are referred to herein collectively as the "Satary Labs."  In particular, CWs 3 and 4, as well as Employee 1, who works for the billing company Satary uses to submit claims to Medicare, have all confirmed that Satary is the true owner of the Satary Labs, as well as Alpha Medical Consulting.

23.      Satary's control of the Satary Labs and Alpha Medical Consulting is corroborated by the movement of money between the various companies, as discussed below.  In addition, on or about July 16, 2019, CW 4 visited the offices of Clio Labs, Elite Labs and Alpha Medical Consulting (which are all located in the same office building in Georgia) with a device capable of making visual and audio recordings.  During the visit, CW 4 recorded a conversation s/he had with an individual who state s/he was "the CEO of CLIO and 360."[1]  CW 4 asks whether samples are going to be sent to Lazarus Labs.  The individual replies that "It doesn't matter, we're all the same lab.  Whether it's Performance, Pathway [another lab controlled by Satary] . . . ."  CW 4 asks if it is all the "same ownership, management."  The individual replies, "more or less, different investors, but we work around it."

24.      CW 3 also made a recording of a conversation with Satary on or about August 23, 2019.  In the recording, CW 3 asks Satary for advice on how to manage Lazarus Services.  Among

---

[1] Based on my investigation, I know that 360 Laboratories is another laboratory controlled by Satary.  This affidavit does not request authorization to seize any assets or accounts belonging to 360 Laboratories..

other things, Satary provides specific instructions to CW 3 about hiring new employees, giving

employees various tasks and complains about a vendor who provided poor service.  In short, the

recording confirms that Satary has operational and managerial control over Lazarus Services.

### B.  Health Care Fraud and Health Care Fraud Conspiracy

Material Lies and Omissions in Medicare Enrollment Documents

25.     This investigation concerns claims submitted to Medicare for Part B[2] and Medicare

Advantage Plans[3] by Performance Labs, Clio Labs and Lazarus Services.

26.     In order to bill Medicare claims for reimbursement for laboratory services they

rendered, Performance Labs, Clio Labs and Lazarus Services each had to apply to Medicare for

what is known as a "provider number."  As part of its application for a provider number, known

as a CMS Form 855B, an authorized official from each lab had to sign a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program
> instructions that apply to this provider.  The Medicare laws,
> regulations, and program instructions are available through the
> Medicare contractor.  I understand that payment of a claim by
> Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations and program
> instructions (including, but not limited to, the federal anti-kickback
> statute and the Stark law), and on the provider's compliance with all
> applicable conditions of participation in Medicare.

27.     CMS Form 855B contained additional certifications that the provider "will not

knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare

and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

---

[2] Individuals who receive benefits under Medicare are referred to as "beneficiaries."  Beneficiaries are
eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part
B"), and prescription drug coverage ("Part D").  Part B covers outpatient physician services, such as office
visits, minor surgical procedures, and laboratory services, such as drug testing and genetic testing, when
certain criteria are met.
[3] The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," providesd
Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private
managed care plans, rather than through the original Medicare program (Parts A and B).

28.     In addition, CMF Form 855B also required the labs to disclose the identity of anyone with a greater than 5% direct or indirect ownership interest in the labs, or anyone who was an individual who "exercised operational or managerial control over, or who directly or indirectly conducted, the day-to-day operations" of the labs.

29.     Even though the nominee owners installed as owners of Performance Labs, Clio Labs and Lazarus Services signed the certifications in which they promised not to violate the Anti-Kickback statute, beginning at least as early as January 2017, as detailed below, Clio Labs began paying illegal kickbacks and bribes to patient recruiters in exchange for the referral of beneficiaries to Clio Labs.  Performance Labs and Lazarus Services also began paying illegal kickbacks and bribes to patient recruiters in or around June 2018 and January 2019, respectively, after Satary obtained control of those labs.

30.     In addition, Performance Labs, Clio Labs and Lazarus Services never disclosed that Satary was the true owner of the labs, or that he exercised operational or managerial control over the labs.

31.     Between January 2017 and the present, Clio Labs has billed Medicare approximately $71 million to Part B, of which approximately $16 million has been paid, much of it into **TARGET ACCOUNTS 2** and **3.**

32.     Between January 2017 and the present, Performance Labs has billed Medicare approximately $369 million to Part B, of which approximately $114 million has been paid, much of it into **TARGET ACCOUNT 1.**[4]

---

[4] Between 2017 and May 2018 – the period before which Performance Labs' billing spiked in June 2018 and Satary obtained control of Performance Labs – it billed Medicare for approximately $1,764,887.

33.     Between January 2017 and the present, Lazarus Services has billed Medicare approximately $13 million to Part B, of which approximately $3.2 million has been paid, much of it into **TARGET ACCOUNTS 4** and **4A**.[5]

34.     In total, since Satary took control of the labs, Performance Labs, Clio Labs and Lazarus Services have been paid approximately $133 million by Medicare, primarily into **TARGET ACCOUNTS 1** through **4A**.   Experts from Medicare contractors responsible for adjudicating and processing claims for Medicare have confirmed that Medicare would not have paid <u>any</u> of the claims had it known (i) that Clio Labs started paying illegal kickbacks and bribes in January 2017, or (ii) that Performance Labs, Clio Labs and Lazarus Services had failed to disclose Satary's operational or managerial control over the labs.

35.     In addition, as discussed in the next section, large numbers of the claims that Performance Labs, Clio Labs and Lazarus Services also were not medically necessary, and were therefore false and fraudulent.

<u>Medically Unnecessary Tests</u>

36.     Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx testing was not a method of diagnosing whether an individual presently had cancer.

37.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."  Title 42, Code of Federal

---

[5] Between 2017 and the end of 2018 – the period before which Satary obtained control of Lazarus Services – it billed Medicare for approximately $695,363.

Regulations, Section 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

38.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

39.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

40.     Medicare reimburses for these tests at rates varying from approximately a few hundred dollars to over $6,000 for a panel of tests.

41.     A review of the Medicare data for Clio Labs, Performance Labs and Lazarus Services shows that large portions of the claims the labs submitted to Medicare were for CGx testing:

       a.     Approximately $57 million of Clio Lab's billing (or approximately 80%) was for CGx testing. Of the $16 million Medicare paid for all of Clio Labs's testing, approximately $15 million (or approximately 93%) was for CGx testing.

b. Approximately $368 million of Performance Lab's billing (or approximately 99%) was for CGx testing. Of the $114 million Medicare paid for all of Performance Labs's testing, nearly 100% of it was for CGx testing.

c. Approximately $12.6 million of Lazarus Service's billing (or approximately 96%) was for CGx testing. Of the $3.2 million Medicare paid for all of Lazarus Service's testing, nearly 100% of it was for CGx testing.

42.     The investigation revealed that Satary, through Clio Labs, Performance Labs, and Lazarus Services paid illegal kickbacks to patient recruiters who used telemarketing to obtain DNA samples from beneficiaries that the labs could use to bill CGx tests to Medicare. The recruiters paid kickbacks and bribes to telemedicine companies in exchange for the doctor's orders that Clio Labs, Performance Labs and Lazarus Services needed in order to bill the claims to Medicare.

43.     For instance, a review of the bank records for Clio Labs's corporate accounts shows that in 2017 and 2018, Clio Labs paid Companies 1 and 2 at least approximately $3.1 million. In the same time period, Companies 1 and 2 paid Company 3 approximately $80,000 in illegal kickbacks. CWs 1 and 2 (the owner and an employee of Company 3), have admitted their criminal liability and are cooperating in this investigation in the hopes that the government might request that they receive lesser sentences. According to CWs 1 and 2, Company 3 utilized call centers in Pakistan, India, and the Philippines to generate Medicare beneficiary leads, and used LinkedIn to find the call centers.

44.     According to CW 5, a former employee of Company 3 interviewed by federal agents in or around November 2018, employees at Company 3 were instructed to sell genetic testing kits to beneficiaries. According to CW 5, employees at Company 3 were instructed to ask beneficiaries if they ever had cancer personally, or whether anyone in their family had been

diagnosed with cancer. If the answer to either question was "yes," (even if the answer to whether the beneficiary had ever had cancer personally was "no,"), the beneficiary was to be considered by the Company 3 employees as qualified to receive a genetic testing kit. As explained *supra*, this is inconsistent with Medicare's rules and regulations and would result in patients being deemed "qualified" who did not meet Medicare's guidelines. In addition, CW 5 also said that s/he was instructed to force products on beneficiaries, force beneficiaries to stay on the phone, and develop fake medical necessity for products. CW 5 was not a medical professional, and had no medical training.

45.     According to CW 1 and CW 2, if a beneficiary indicated that he or she had either a personal diagnosis of cancer or a familial cancer diagnosis and agreed to receive the genetic testing kit, Company 3 shipped the testing kit to the beneficiary.[6] Upon confirmation of delivery, a Company 3 employee would call the beneficiary with step-by-step instructions for the swabbing test. The beneficiary would then mail the completed swab back to Company 3.

46.     According to CWs 1 and 2, Company 3 then sold the completed swab to the Companies 1 and 2 without a completed doctor's orders, also known as "D.O.s," using a "marketing" contract to disguise the illegal kickbacks and bribes. According to a contract between Company 1 and Company 3, which was obtained in response to a grand jury subpoena and dated February 20, 2018, Company 1 paid $1,500 to Company 3 for each comprehensive cancer genetic test, $1,000 for each colorectal/pancreatic cancer genetic test, $400 for each BRCA1/BRCA2 genetic test, and $100 for each pharmacogenomics test. These payments were illegal kickbacks in violation of Title 42, United States Code, Section 1320a-7b.

---

[6] DNA samples were collected from beneficiaries primarily through a "buccal swab," which is a manner of collecting DNA from the inside of a person's cheek using sterile swabs with cotton tips.

47.     According to CW 2, after receiving the completed swab and beneficiary information from Company 3, Companies 1 and 2 obtained a D.O. for the completed swab from a telemedicine company.  According to a March 21, 2018 contract between Companies 1 and 2 and Company 5, a telemedicine company with its principal place of business in Florida, which was obtained pursuant to a grand jury subpoena, Companies 1 and 2 would pay $35 an hour to Company 5 for "third-party physician concierge management services."  In reality, CW 2 stated, s/he was purchasing doctor's orders.

48.     The telemedicine doctors were not treating the beneficiaries for symptoms of any illness, including cancer.  Accordingly, the CGx tests were not medically necessary as required for Medicare claims under Title 42, United States Code, Section 1395y(a)(1)(A).

49.     Between November 2018 and August 2019, law enforcement agents interviewed approximately ten beneficiaries for whom Clio Labs submitted claims for CGx.  The beneficiaries stated that they were contacted by telemarketers offering CGx or attended health fairs or cancer screening seminars where representatives of CGx marketing companies marketed the benefits of completing CGx. All but one of the beneficiaries did not know or recognize the name of the physician who ordered the CGx, nor did he/she consult his/her primary care physician concerning the CGx.  For example, on January 10, 2019 agents interviewed J.P., a beneficiary who attended a cancer screening seminar with his/her spouse at their local synagogue.  During the seminar, marketing representatives spoke with them about the benefits of cancer screening, walked them through a self-administered CGx test and provided them with a complimentary lunch.  According to Medicare data, Clio Labs submitted approximately $23,982 in claims for J.P., and approximately $27,729 for J.P.'s spouse.

50.     According to bank records obtained pursuant to grand jury subpoenas, between 2017 and 2018, Clio Labs paid Companies 1 and 2 approximately $3.1 million.  Companies 1 and 2 paid Company 5 approximately $112,000 in the same time period.  And in the same time period, Companies 1 and 2 paid Company 3 approximately $80,000.  All of these payments were illegal kickbacks and bribes.

51.     Satary repeated this process at Performance Labs.  As noted, CW 3 is the interim CEO of Lazarus Services and has filed a *qui tam* relating to Satary and the Satary Labs.  CW 3 also told federal law enforcement about the mechanism by which Satary used to drive volume at Clio and Performance Labs.  According to CW 3, Satary relied on companies and individuals, like Individual 2 and Company 4, who used telemarketing and telemedicine to obtain DNA samples and D.O.s.  Satary paid illegal kickbacks and bribes to those companies and individuals in exchange for the referrals.  Specifically, CW 3 stated that Individual 2 told him/her that Individual 2 owned durable medical equipment companies that ran television and internet advertisements.  These advertisements touted the provision of back and knee braces to Medicare beneficiaries at little or no charge.  Medicare beneficiaries, lured by this promise, called in to a call center to request the equipment, and were asked to provide their Medicare and other personal information.

52.     CW 3 stated that Individual 2's call center employees, who were not licensed medical professionals, concluded this call by asking whether the beneficiary had a personal or family history of any type of cancer.  If a beneficiary noted any history of cancer—personal *or* family—the beneficiary was offered a "free" hereditary cancer screening test, and was told that the test would be paid for by Medicare.  If this "free" test was accepted, the beneficiary's contact and Medicare information were then transferred to a telemedicine company owned by Individual 2's business partner, Individual 7.  After the telemedicine doctor signed the authorization, a DNA

collection kit containing cotton swabs and a specimen bag were sent to the beneficiary in a pre-addressed, pre-paid package. Beneficiaries were asked to swab the inside of their cheek, deposit the DNA sample in the specimen bag, and mail all of the above back to Lotus Health.

53.    Federal agents have corroborated CW 3's statements through consensually monitored calls conducted with Individual 2 and through a search warrant executed on Individual 2's email account. In addition, between January 2017 and the present, bank records obtained through grand jury subpoena show that Clio Labs, Performance Labs or other entities controlled by Satary have paid Company 4 approximately $3.9 million.

54.    In addition, in or around August 20, 2019, federal agents interviewed Doctor 1. The interview was not protected by a proffer letter. Doctor 1 explained s/he had been contacted by Individual 7 to perform telemedicine consultations. Doctor 1 stated s/he would receive an email in his/her email account from Individual 7's email account with an attachment for and order for either durable medical equipment or a CGx test.[7] Each form was pre-filled and only needed to be signed by the doctor. Doctor 1 stated s/he spent 2-3 minutes on each order, reading them and clicking on the document to affix his/her signature to the documents. Doctor 1 admitted that s/he never saw tests results, was not treating the beneficiaries for cancer or any cancer symptoms, and did not have any doctor-patient relationships with any of the beneficiaries. In exchange, Doctor 1 received $20-$30 for each file s/he reviewed. According to Medicare data, between 2018 and 2019, Doctor 1 approved CGx tests for 1,142 beneficiaries for whom Performance Labs submitted a claim to Medicare. Performance Labs billed approximately $22 million for the tests, of which Medicare paid $6.4 million.

---

[7] Doctor 1 stated s/he also received orders for another type of genetic test called pharmacogenetics testing, or "PGx" testing.

55.    Lazarus Services also submitted claims for medically unnecessary CGx tests procured through telemarketing and telemedicine.  Between January and June 2019, Lazarus Services submitted approximately $9.3 million in claims to Medicare, of which $2.3 million was paid.  70% of the claims were ordered by physicians who had never billed Medicare for an office visit with the beneficiary.

56.    CW 3 told agents that since in or around late July 2019, Satary has instructed his staff that billing and testing of CGx samples should be shifted from Performance Labs to Lazarus Services.  After Satary issued that directive, CW 3 stated, hundreds of CGx samples began being shipped to Lazarus Services.  Many of the samples had paperwork or labels on them indicating that the samples were from Performance Labs.  Within the last four weeks, an employee of Satary's instructed CW 3 and his/her employees to change the labels and paperwork to labels and paperwork for Lazarus Services.  CW 3 stated that the doctor's orders accompanying the samples delivered from Performance Labs to Lazarus Services indicate that the tests have been ordered by telemedicine doctors.

57.    Medicare data corroborates CW 3's statements.  According to Medicare claims data, in the last 9 weeks, the billing for Performance Labs has decreased from approximately $28 million in one week during the week of July 14 to approximately $17 million the week of September 8, 2019.  Lazarus Services has increased from approximately $1.6 million in billing the week of July 14 to approximately $4.5 million the week of September 8, 2019.

58.    Federal agents interviewed beneficiaries for whom Lazarus Services had billed CGx testing to Medicare.  Each confirmed that they had never seen or spoken with the doctor who ordered the CGx test, and that they agreed to take the test after receiving some kind of marketing pitch about the test.  For instance, Beneficiary 1 told federal agents that s/he received a

18

telemarketing call regarding CGx.  S/he agreed to receive the kit in the mail.  Beneficiary 1 received the kit, provided a DNA sample, and sent it back to the return address on the shipping label.  Beneficiary 1 told agents that s/he had never been diagnosed with cancer, nor had anyone in his family had cancer.  Rather, Beneficiary 1 was simply curious to see if s/he was susceptible to cancer.  Beneficiary 1 did not recall receiving test results for the test, and did not discuss the test results with his/her doctor.  Beneficiary 1 did not recognize the name of the doctor who authorized the test, and never spoke to a doctor before or after receiving the test.  Beneficiary 1 said that if s/he had known the test would cost Medicare thousands of dollars, s/he would have hung up the phone immediately.  Lazarus Labs submitted $14,847 in claims for genetic testing for Beneficiary 1, of which $6,983 was paid.

Alpha Medical Consulting

59.     Alpha Medical Consulting was incorporated under the laws of Georgia on or about January 3, 2018.  According to CW 3, the purpose of Alpha Medical Consulting is to pay marketers so that the Satary Labs do not pay the marketers directly.[8]  On or about July 29, 2019, CW 3 made a consensually recorded phone call with an officer of Alpha Medical Consulting.  The officer explained how Alpha Medical Consulting disguised the kickbacks and bribes it paid marketers who referred CGx tests and doctor's orders to the Satary Labs.  The officer explained that Alpha Medical Consulting paid marketers based on "work hours."  For example, s/he said, marketers are paid $200 per hour for marketing efforts.  In reality, however, this is simply a way to disguise the kickbacks.  As the officer explained, if a marketer sends in a CGx sample for a beneficiary with a personal history of cancer, the marketer invoices Alpha Medical Consulting for 9 hours of work.  At $200 per hour, that is $1,800 for one CGx sample.  For beneficiaries with only a family history

---

[8] CWs 3 and 4 also understand that Alpha Medical Consulting has some responsibility for billing for the Satary Labs.

of cancer, Alpha Medical Consulting will be invoiced for 6 hours of work, and for PGx tests, invoiced 2 hours. In the officer's words, "So we will back into the invoice." The officer explained that s/he "already know[s] there's undercover people out there," so when she is "vetting" a new marketer, "what are billable hours for, I don't answer that."

## C. Receipt of Medicare Proceeds and Laundering of Funds

### Directly Traceable Fraud Proceeds

60.     As mentioned above, all payments from Medicare to Clio Labs, Performance Labs and Lazarus Services were the proceeds of fraud; Medicare would not have paid any of the claims these labs submitted if it had known that (i) the labs paid kickbacks and bribes to patient recruiters in exchange for CGx samples, or that (ii) Satary failed to disclose his ownership in, and operational and managerial control over, Clio Labs, Performance Labs and Lazarus Services.

61.     All payments from Medicare to Clio Labs were transferred into **TARGET ACCOUNTS 2** and **3**. Between in and around November 2018 and in or around May 2019, approximately $200,139.51 in proceeds of this health care fraud and health care fraud conspiracy were deposited into **TARGET ACCOUNT 2**. As of on or about July 31, 2019, **TARGET ACCOUNT 2** had at least $72,737.24 in funds traceable to the health care fraud and fraud conspiracy described above. Between in or around August 2017 and in or around November 2018, approximately $16,026,284.52 in proceeds of this health care fraud and health care fraud conspiracy were deposited into **TARGET ACCOUNT 3**. As of on or about March 31, 2019, **TARGET ACCOUNT 3** had at least $2,785.98 in funds traceable to the health care fraud and fraud conspiracy described above.

62.     All payments from Medicare to Performance Labs were transferred into **TARGET ACCOUNT 1**. Between on or about February 21, 2018, and on or about August 30, 2019,

**TARGET ACCOUNT 1** received approximately $121,830,196.31 from Medicare.  As of on or about August 31, 2019, **TARGET ACCOUNT 1** had at least $1,298,742.13 in funds traceable to the health care fraud and fraud conspiracy described above.

63.     On or about June 21, 2019 another approximately $1,138,932.39 of this health care fraud and health care fraud conspiracy were deposited into **TARGET ACCOUNT 4A** in the name of Lazarus Services at Frost Bank.  As of on or about July 5, 2019, **TARGET ACCOUNT 4A** had at least $449,206.39 in funds traceable to the health care fraud and fraud conspiracy described above.  As stated previously by your affidavit, between on or about June 17, 2019 and June 28, 2019 another approximately $548,586.64 in proceeds of this health care fraud and health care fraud conspiracy were deposited into an account **TARGET ACCOUNT 4**.  After serving the previous seizure warrant on Whitney Hancock Bank, your affiant learned from review of bank records that between on or about July 2, 2019, and September 26, 2019, another approximately $4,949,700.98 in proceeds of this health care fraud and health care fraud conspiracy were deposited into **TARGET ACCOUNT 4**, although most of those funds have since been withdrawn.  As of on or about June 30, 2019, **TARGET ACCOUNT 4** had a remaining balance of $1,240,254.21 in funds traceable to the health care fraud and fraud conspiracy described above.

### Money Laundering – Performance Labs

64.     Just as Satary hid and concealed his ownership of Performance Labs from Medicare, Satary also hid and concealed his ownership and control over the funds deposited into the account into which Medicare paid Performance Labs, **TARGET ACCOUNT 1.**  Specifically, Satary was not a signatory on **TARGET ACCOUNT 1.**  Nonetheless, over 75% of the Medicare money deposited into **TARGET ACCOUNT 1** was quickly transferred to an account on which

Satary was a signatory, to wit, a now-closed Performance Labs account at Grand South Bank, ending in 5534 (the "Closed Performance Labs Account").

65.     Specifically, as mentioned, between on or about October 19, 2018, and on or about July 26, 2019, **TARGET ACCOUNT 1** received approximately $94,212,435.63 from Medicare. Between on or about October 19, 2018 and on or about July 26, 2019, approximately $92,997,285.29 in fraud proceeds were transferred from **TARGET ACCOUNT 1** to the Closed Performance Labs Account.

66.     The Closed Performance Labs Account made subsequent transfers to seven other target accounts (**TARGET ACCOUNTS 2**, **5** and **7 through 11**).  Although Satary was not a signatory on **TARGET ACCOUNT 1**, Satary was a signatory on **TARGET ACCOUNT 2**. According to witnesses, Satary controlled **TARGET ACCOUNTS 5** and **7 through 11**.[9]   For instance:

    a.     Between on or about October 22, 2018 and on or about July 26, 2019, at least $2,905,571 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 2**.  The funds that **TARGET ACCOUNT 2** received from the Closed Performance Account were further laundered to a corporate account controlled by Satary, including **TARGET ACCOUNT 7**.  The funds were then used, in part, to pay illegal kickbacks and bribes to patient recruiters like CW 4.

    b.     Between on or about October 23, 2018 and on or about July 26, 2019, at least $8,112,678 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 5**.  The funds that **TARGET ACCOUNT 5** received from the Closed Performance Account were further laundered to a corporate account controlled by Satary,

_____

[9] **TARGET ACCOUNT 11**'s signatory is a close family member of Satary.

including **TARGET ACCOUNT 7** and **8,** as well as a personal account controlled by Satary, **TARGET ACCOUNT 10.**

        c.      Between on or about March 12, 2019, and on or about July 18, 2019 at least $2,624,350 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 7.** The funds that **TARGET ACCOUNT 7** received from the Closed Performance Account were further laundered to a corporate account controlled by Satary, including **TARGET ACCOUNT 9.**

        d.      Between on or about November 9, 2018 and on or about June 14, 2019 at least $302,553 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 8.**

        e.      Between on or about January 30, 2019 and on or about June 17, 2019 at least $400,000 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 9.**

        f.      Between on or about October 22, 2018 and on or about July 26, 2019 at least $10,600,178 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 10.** The funds that **TARGET ACCOUNT 10** received from the Closed Performance Account and were further laundered to corporate accounts controlled by Satary, including **TARGET ACCOUNTS 4, 11, 12, 13, 14** and **15.**[10]

        g.      Between on or about July 22, 2019 and on or about July 23, 2019 at least $400,000 in proceeds were transferred from the Closed Performance Labs Account to **TARGET ACCOUNT 11.**

---

[10] **TARGET ACCOUNTS 11, 12,** and **13**'s signatory is a close family member of Satary. According to records on file with the Georgia Secretary of State, that family member owns Shefa International.

67.     On or about July 29, 2019, Grand South Bank closed the Closed Performance Labs Account.  On or about July 30, 2019, **TARGET ACCOUNT 6** was opened.  The same family member who was a signatory on **TARGET ACCOUNT 10** is also a signatory on **TARGET ACCOUNT 6.**

68.     Between on or about July 27, 2019, and on or about August 30, 2019, **TARGET ACCOUNT 1** received approximately $25,517,096.02 from Medicare.  Between on or about August 14, 2019 and on or about August 30, 2019, at least $22,400,571 in fraud proceeds were transferred from **TARGET ACCOUNT 1** to **TARGET ACCOUNT 6**.  The funds that **TARGET ACCOUNT 6** received from **TARGET ACCOUNT 1** were further laundered to corporate accounts controlled by Satary, including **TARGET ACCOUNTS 2**, **5**, and **7** and a personal account controlled by Satary, **TARGET ACCOUNT 10**.  For instance:

a.     Between on or about August 13, 2019 and on or about August 23, 2019 at least $166,100 in proceeds were transferred from **TARGET ACCOUNT 6** to **TARGET ACCOUNT 2**.

b.     Between on or about August 13, 2019 and on or about August 28, 2019 at least $3,415,200 in proceeds were transferred from **TARGET ACCOUNT 6** to **TARGET ACCOUNT 5**.

c.     Between on or about August 8, 2019 and on or about August 27, 2019 at least $999,940 in proceeds were transferred from **TARGET ACCOUNT 6** to **TARGET ACCOUNT 7**.

d.     Between on or about August 15, 2019 and on or about August 26, 2019 at least $3,996,061 in proceeds were transferred from **TARGET ACCOUNT 6** to **TARGET ACCOUNT 10**.

<u>Money Laundering – Lazarus Services</u>

69.     Similarly, Satary used **TARGET ACCOUNT 4** and **TARGET ACCOUNT 4A** to launder the proceeds of his fraud.     On or about June 21, 2019, another approximately $1,138,932.39 of this health care fraud and health care fraud conspiracy were deposited into **TARGET ACCOUNT 4A**. Another approximately $548,586.64 in proceeds of this health care fraud and health care fraud conspiracy were deposited into an account **TARGET ACCOUNT 4**. Satary was not a signatory on either **TARGET ACCOUNT 4** or **TARGET ACCOUNT 4A**. However, his close family member was a signatory on the accounts.  CW 3 was also a signatory on **TARGET ACCOUNT 4A**.  CW 3 told agents that although Satary's family member was the signatory on the account, CW 3 never received instructions on how to move funds in the account from the family member.  Rather, all directions came from Satary directly.  Satary used his family member as the signatory on the accounts to hide and conceal his ownership and control over the Medicare funds deposited into **TARGET ACCOUNTS 4** and **4A**.

70.     On or about June 2, 2019, Satary instructed CW 3 to transfer $689,700 from **TARGET ACCOUNT 4A** to **TARGET ACCOUNT 10**.

### IV.     **RELEVANT STATUTES AND JURISDICTION**

71.     Pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to health care fraud offenses in violation of 18 U.S.C. §§ 1347 and 1349 is subject to criminal forfeiture to the United States.

72.     Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957, or any property traceable to such property, is subject to criminal forfeiture to the United States.

73.     Pursuant to 21 U.S.C. § 853(f) as incorporated by 18 U.S.C. § 982(b)(1), the "Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant.  If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that [a protective] order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property."

74.     Based on my training and experience, I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder.  In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.  Additionally, based upon the investigation described above, your affiant is aware that Satary has a felony conviction for fraudulent copyright infringement conspiracy and has masterminded a criminal fraud, kickback, and money laundering scheme involving over $100 million dollars and more than a dozen bank account in corporate names using complicit nominees.  Your affiant believes that if the funds subject to forfeiture are left in these various financial institutions, Satary and his co-conspirators may attempt to deceive or influence the banks in an effort to obtain the funds.

## V.   **CONCLUSION**

75.   Based on the foregoing, your affiant submits that there is probable cause to seize the **TARGET ASSETS** and that a protective order pursuant to 21 U.S.C. § 853(e) may not be sufficient to ensure the property's availability for criminal forfeiture.

FURTHER AFFIANT SAYETH NAUGHT.

Ronald Rushneck
Special Agent
Federal Bureau of Investigation


Sworn and subscribed before me
this 27th day of September, 2019.

HONORABLE DANA M. DOUGLAS
UNITED STATES MAGISTRATE JUDGE